FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 NOV 13 AM 10: 45

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76890-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OSCAR LUIS URBINA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 13, 2018 |
| | ) | |

VERELLEN, J. — Oscar Luis Urbina appeals his convictions of rape and unlawful imprisonment. He contends that the trial court erred in admitting statements he made to police officers following his arrest because he is a native Spanish speaker, not fluent in English, and police officers conducted the interview in English without the assistance of an interpreter. He also challenges the admission of the victim's out-of-court statements to a hospital social worker and a sexual assault nurse examiner and the sentencing court's refusal to find that his crimes encompassed the same criminal conduct for purposes of calculating his offender score. Finding no error, we affirm.

### FACTS

At around 11:30 p.m. on March 6, 2016, A.R. was waiting for a bus in West Seattle when Oscar Urbina, a man she had never met, pulled up and offered her a ride in his vehicle. A.R. accepted. Urbina told A.R. he wanted a "date," which

A.R. understood to mean that he wanted to pay her for sex. For the majority of her adult life, A.R. has struggled with a drug addiction and has supported herself through prostitution. Although A.R. had not planned to solicit customers that night, she agreed.

Urbana insisted that they go to his apartment. On the way, he stopped at a convenience store to buy beer. A.R. noticed that Urbina was swerving as he drove and appeared to be intoxicated.

When they arrived at his apartment, Urbina gave A.R. $40. Then Urbina became "rude," demanding that she remove her clothes.[1] A.R. made a telephone call, but when she tried to make a second call, Urbina grabbed her cell phone, threw it, and broke it.

Urbina's increasingly aggressive behavior made A.R. uncomfortable, and she tried to return his money and leave. Urbina started saying "weird" things and told A.R. he would not let her leave the apartment alive.[2] A.R. begged Urbina to let her go, but each time she moved toward the door, he blocked her path.

A.R. screamed for help, and Urbina hit her in the head and the face. There was "blood everywhere."[3] Pretending to cooperate and look for condoms in her purse, A.R. retrieved a can of mace and sprayed Urbina with it. That only made things "worse."[4]

---

[1] Report of Proceedings (RP) (Nov. 2, 2016) at 623.

[2] Id. at 625.

[3] Id. at 626.

[4] Id.

Urbina experienced intense pain and became enraged. He choked A.R., telling her she was "going to die."[5] A.R. briefly lost consciousness. Urbina told A.R. that he would kill her, put her body in a dumpster, and no one would remember her. Urbina forced A.R. to help him rinse off the mace. Even after he was affected by the mace, Urbina was still able to prevent A.R. from leaving. He closed the bedroom door and then continued to block the other doorways and hit her to prevent her escape.

During the course of the night, Urbina sexually assaulted A.R. seven times. He had vaginal, oral, and anal intercourse with her. At first, Urbina refused to wear a condom, insisting that he wanted A.R. to become pregnant. He agreed to do so after A.R. lied to him and told him that she was infected with AIDS.[6] The forcible anal intercourse caused A.R. intense pain and made her feel "degraded."[7]

Eventually, at around 4:00 a.m., Urbina passed out, and A.R. was able to leave the apartment. She grabbed some of her belongings and fled in the nude. She partially dressed herself as she walked to a nearby 7-11. She told the store clerk what happened and asked to use the telephone so she could call a friend. She had no intention of calling the police, believing the police would not help her. The store clerk called 911.

---

[5] Id. at 627.

[6] Acquired immune deficiency syndrome.

[7] RP (Nov. 2, 2016) at 631.

3

Police officers responded and found A.R. visibly frightened and upset. She had bruising, swelling, red marks, and scratches on her face and neck. A.R. led the police to Urbina's apartment, where he was arrested later the same day. Police then sent A.R. to the hospital for treatment. A sexual assault nurse examiner observed abrasions and evidence of strangulation and also took swabs for DNA[8] testing.

Police recovered a bloody pillow and several used condoms from Urbina's apartment. Later testing of A.R.'s shorts revealed a profile consistent with a mixture of A.R.'s and Urbina's DNA. Blood on the pillow found in the apartment also matched A.R.'s DNA profile. When he was arrested, Urbina had scratch marks on his face and neck.

The State charged Urbina with rape in the second degree and unlawful imprisonment with sexual motivation. At his trial, Urbina testified that he had a consensual encounter with A.R. He said that he paid A.R. $40 and had vaginal intercourse with her. According to Urbina, A.R. lost her cell phone in his apartment, and he helped her search for it. He said that while searching, he briefly left to use the restroom, and when he returned, A.R. sprayed him with mace. He did not know why A.R. attacked him, but he thought she might have been angry because he was unable to find her phone. Urbina said that A.R. was apologetic later on and offered to return his money. Then, according to Urbina, A.R. rubbed some lotion on him, initiated sexual intercourse again, and then left the apartment.

---

[8] Deoxyribonucleic acid.

Urbina explained that he had scratches on his face and neck at the time of his arrest because he had recently been cutting trees. He also suggested that A.R.'s blood may have been planted on his pillow.

The jury convicted Urbina as charged.

Custodial Statements

Urbina claims that the trial court erred in admitting his custodial statements.[9] He contends that because he is not fluent in English and police officers interrogated him exclusively in English, the State failed to prove that he knowingly and intelligently waived his rights under Miranda v. Arizona.[10]

At the CrR 3.5 hearing, Officer Andrew Bass testified that immediately after he arrested Urbina, he advised him of his Miranda rights in English. Because Urbina did not appear to fully understand, another officer with a "better grasp" of Spanish advised him of his Miranda rights in Spanish using a preprinted Seattle Police Department form.[11] That officer simultaneously showed Urbina the Spanish written form so he could follow along. Officer Bass then transported Urbina to the police station without asking him any questions.

After Urbina arrived at the police station, Detective Maurice Washington assessed his English ability. He learned that Urbina had been living in the United

---

[9] Urbina's argument below focused on the admissibility of his statements under the Privacy Act, chapter 9.73 RCW. Nevertheless, for purposes of this opinion, we assume that he preserved his claim of error.

[10] 384 U.S. 436, 86 S Ct. 1602, 16 L. Ed. 2d 694 (1966).

[11] RP (Oct. 24, 2016) at 51.

States for 20 years and, based on his conversation with Urbina, concluded that his ability was sufficient to conduct the interview in English without the assistance of an interpreter. Before starting the interview, Detective Washington again advised Urbina verbally of his <u>Miranda</u> rights in English. He also provided Urbina with the Department's preprinted advisement forms in both English and Spanish and allowed him to read the forms. Urbina signed both the English and Spanish forms and affirmatively acknowledged that he understood his rights.

Together with another officer, Detective Washington interviewed Urbina for just under two hours. Detective Washington acknowledged that at the end of the interview, when discussing Urbina's prior agreement to record the interview, Urbina mentioned that there would have been "[m]ore better communication" with a translator.[12] Nevertheless, the detective testified that he and Urbina were able to understand each other throughout the interview. If Urbina did not understand a question, Detective Washington asked the question in a different way, and there was never a breakdown in communication.

In addition to the police officers' testimony, the court considered the Spanish and English forms Urbina signed acknowledging his rights and the video footage that showed the police officers advising Urbina of his rights at the time of his arrest and at the outset of the interview. Based on its review of the evidence, the court found that Urbina "functions well in an English-speaking environment."[13]

---

[12] <u>Id.</u> at 73.
[13] <u>Id.</u> at 85.

6

Nevertheless, the court also recognized that Urbina is "not fluent" in English and noted that he was also advised of his rights twice in Spanish, both verbally and in writing.[14] The court determined that it was "quite obvious" from the video footage that Urbina is able to read Spanish.[15] The video of Urbina's arrest showed that he read the Spanish advisement form as the police officer read it aloud in Spanish and made verbal cues to indicate his comprehension. The video evidence of Urbina's interview also depicted Urbina "looking at the words in Spanish and tracking" the Spanish advisement form and showed the detective pointing to the exact Spanish language that corresponded to the English advisement form as he read it.[16] Based on all the evidence, the court ruled that Urbina's statements to the police officers were admissible because he validly waived his Miranda rights.

Prior to a custodial interrogation, a suspect must be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning."[17] Any waiver of these rights by the suspect must be knowing, voluntary, and intelligent.[18] In determining whether a defendant voluntarily waived Miranda rights, we consider

---

[14] Id.

[15] Id. at 86.

[16] Id. at 85.

[17] Miranda, 384 U.S. at 479.

[18] State v. Radcliffe, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008).

7

the totality of the circumstances.[19]  Language barriers do not prevent a valid

waiver:

> Although a suspect's ability to make a knowing and intelligent waiver of his Miranda rights may be inhibited by language barriers, a valid waiver may be effected when a defendant is advised of his Miranda rights in his native tongue and claims to understand such rights. Further, the translation of Miranda from English to Spanish need not be perfect--it is sufficient that the defendant "understands that he does not need to speak to police and that any statement he makes may be used against him."[20]

A reviewing court will not disturb a trial court's conclusion that a waiver was

voluntarily made if the trial court found, by a preponderance of the evidence, that

the statements were voluntary, and substantial evidence in the record supports the

finding.[21]  Substantial evidence exists where there is a sufficient quantity of

evidence in the record to persuade a fair-minded, rational person of the truth of the

finding.[22]

Urbina's claim that he did not fully understand the conversation during the

custodial interview is not relevant to the question of whether he validly waived his

rights.  As we noted in State v. Lopez, whether the defendant understood English

sufficiently to intelligently converse with a police officer "is a question of fact, and

one that is different from the question of a voluntary waiver of rights, as required

by Miranda, and from the question of police coercion or other police misconduct

---

[19] State v. Allen, 63 Wn. App. 623, 626, 821 P.2d 533 (1991).

[20] State v. Teran, 71 Wn. App. 668, 672, 862 P.2d 137 (1993), abrogated on other grounds by State v. Neeley, 113 Wn. App. 100, 105, 52 P.3d 539 (2002).

[21] State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).

[22] State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

for purposes of determining whether a statement that cannot be used in the State's case in chief may be used for rebuttal or impeachment."[23] Here, police officers advised Urbina of his rights under Miranda upon his arrest and before interviewing him at the police station. He was advised in both languages, both orally and in writing. He signed written acknowledgments of his rights in both languages. The court found that Urbina is able to read Spanish. The court further found, based on the record, that Urbina's English skills are functional. To the extent that Urbina challenges this finding, Detective Washington's testimony supports it. The finding is not inconsistent with the court's finding that Urbina was not fully fluent in English.[24] The record supports the court's finding that Urbina was advised of his Miranda rights and that he knowingly, intelligently, and voluntarily waived those rights.

In a related argument, Urbina contends that his custodial statements were involuntary and therefore, inadmissible for any purpose.[25] His claim is based on his lack of fluency in English, his assertion that police interrogation is inherently coercive, and the fact that the custodial interview took place in a 400-square foot

---

[23] 74 Wn. App. 264, 270, 872 P.2d 1131 (1994).

[24] Urbina used the services of an interpreter throughout the trial.

[25] The State admitted Urbina's custodial statements only to impeach his trial testimony. Statements obtained in violation of Miranda are admissible for the purpose of impeachment. Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990). The only limitation on this rule is that the statements must be voluntary; involuntary statements are inadmissible for all purposes. Dickerson v. United States, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

room without windows at the Seattle Police Department headquarters, which he claims "contributed to the coercive effect" of the interrogation.[26]

The fact that Urbina chose to speak to police officers after being informed of his Miranda rights is strong evidence his statements were voluntary.[27] And again, the existence of a language barrier, in and of itself, is not determinative of voluntariness.[28] As was the case in State v. Davis, where the defendant claimed that his post-Miranda statements were involuntary due to a coercive "environment and atmosphere,"[29] Urbina does not point to any misrepresentations or specific coercive conduct, nor does he maintain that he was, in fact, coerced. The trial court specifically found that Urbina's statements were voluntary and that there was no evidence of police coercion. The record supports that finding. The impeachment value of the Urbina's prior statements, in light of his trial testimony that he did not understand the detective's questions, was properly resolved by the jury.[30]

<u>Statements to Medical Treatment Providers</u>

Urbina next challenges the trial court's admission of testimony about A.R.'s statements by two medical professionals, social worker Nicole Blythe and sexual assault nurse examiner Karen Sidi. While ER 803(a)(4) allows the admission of

---

[26] Appellant's Br. at 18.

[27] See State v. Baruso, 72 Wn. App. 603, 611, 865 P.2d 512 (1994).

[28] Lopez, 74 Wn. App. at 270.

[29] 82 Wn.2d 790, 792, 514 P.2d 149 (1973).

[30] See Lopez, 74 Wn. App. at 271.

out-of-court statements made for the purpose of medical diagnosis or treatment, Urbina claims that many of A.R.'s statements reported by Blythe and Sidi were not pertinent to medical diagnosis or treatment and were made in furtherance of a criminal investigation.

ER 803(a)(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "Medical diagnosis and treatment" includes both physical and psychological treatment.[31] A statement is reasonably pertinent to diagnosis or treatment when "(1) the declarant's motive in making the statement is to promote treatment, and (2) the medical professional reasonably relied on the statement for purposes of treatment."[32] A declarant's statement to a treatment provider need not be solely related to medical diagnosis or treatment; it may be for a combination of purposes, including medical and forensic purposes.[33]

With respect to the social worker's testimony, Urbina failed to object. Pretrial, Urbina reserved the right to later object to testimony about statements A.R. made for purposes other than medical diagnosis or treatment. He did not,

---

[31] State v. Woods, 143 Wn.2d 561, 602, 23 P.3d 1046 (2001).

[32] State v. Williams, 137 Wn. App. 736, 746, 154 P.3d 322 (2007).

[33] Id. at 746-47.

however, raise any objection to the social worker's testimony. As such, Urbina waived any claim of error.[34]

Most of A.R.'s statements reported by the sexual assault nurse examiner were reasonably pertinent to the diagnosis and treatment of her physical and psychological injuries. For instance, A.R.'s statements that Urbina threw her on the bed, that he threatened to kill her and throw her body in a dumpster, that he raped her vaginally, orally, and anally, that he choked her, and that she used mace in an attempt to defend herself were all reasonably pertinent to her treatment and diagnosis.

The nurse's testimony included a small number of statements that do not appear to be relevant to A.R.'s treatment and diagnosis, such as A.R.'s statements that she did not believe the police would help her if she reported the crime, that Urbina stopped at a convenience store to purchase beer, and that she felt "weird" when she arrived at Urbina's apartment and tried to return his money. But even if the trial court erred in admitting these statements, the error was harmless. An erroneous decision to admit evidence is grounds for reversal only if, within reasonable probabilities, the error materially affected the outcome of the trial.[35] The nurse's testimony about A.R.'s statements was cumulative of other properly admitted testimony, including the social worker's unchallenged testimony and A.R.'s own testimony.

---

[34] RAP 2.5(a).

[35] State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

12

Urbina maintains that the error was prejudicial because A.R.'s out-of-court statements bolstered her trial testimony. However, the inadmissible statements reinforced A.R.'s testimony only as to a few peripheral points. And more importantly, as in State v. Ramirez-Estevez, the victim testified and was subject to cross-examination.[36] "Being subject to such cross-examination itself diminished, if not extinguished, the type of prejudice that sometimes results from admission of hearsay where the declarant is not subject to cross-examination at trial."[37] A.R.'s live testimony before the jury eclipsed her earlier statements recounting the incident. And we defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence.[38] There is no reasonable probability that the outcome of the trial would have been different had the sexual assault nurse examiner's testimony included only A.R.'s statements that were relevant to her diagnosis and treatment.

Same Criminal Conduct

Finally, Urbina contends that the sentencing court abused its discretion by refusing to find that his convictions of rape and unlawful imprisonment did not involve the same criminal conduct for the purposes of calculating his offender score. He claims the rape and unlawful restraint were a part of a single episode and the purpose of the restraint was to facilitate the rape.

---

[36] 164 Wn. App. 284, 263 P.3d 1257 (2011).

[37] Id. at 293.

[38] See State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

A trial court calculates a defendant's offender score for sentencing purposes by counting current offenses and past convictions.[39] Current offenses constitute the same criminal conduct and count as a single crime if they "require the same criminal intent, are committed at the same time and place, and involve the same victim."[40] All three criteria must be present.[41]

Our Supreme Court has "repeatedly observed that a court's determination of same criminal conduct will not be disturbed unless the sentencing court abuses its discretion or misapplies the law."[42] When calculating an offender score, the sentencing court abuses its discretion by arriving at a contrary result "when the record supports only one conclusion on whether crimes constitute the 'same criminal conduct.'"[43] "But where the record adequately supports either conclusion, the matter lies in the court's discretion."[44] "[I]n deciding if crimes encompassed the same criminal conduct, trial courts should focus on the extent to which the criminal intent, as objectively viewed, changed from one crime to the next. . . . [P]art of this analysis will often include the related issues of whether one crime furthered the other."[45] [46]

---

[39] RCW 9.94A.589(1)(a).

[40] Id.

[41] State v. Lessley, 118 Wn.2d 773, 778, 827 P.2d 996 (1992).

[42] State v. Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013).

[43] Id. at 537-38.

[44] Id. at 538.

[45] State v. Dunaway, 109 Wn.2d 207, 215, 743 P.2d 1237, 749 P.2d 160 (1987).

Urbina relies on State v. Phuong[47] and State v. Saunders.[48] The sentencing court expressly considered Phuong and Saunders and concluded they were distinguishable chiefly because each involved a relatively brief period of detention, whereas here, according to her testimony, A.R. was restrained for approximately four hours. The court explained:

> This is a case where it's the ordeal of being restrained and restrained and restrained no matter what efforts she made, whether it was pretending consent or trying to be nice or fighting or anything that made this such an atrocious crime for this victim. So that's the first thing is it's really a long period of time, and I just think that's different, and that takes this out of the same criminal conduct analysis.

---

[46] The State relies on State v. Chenoweth, 185 Wn.2d 218, 370 P.3d 6 (2016), involving convictions of child rape and incest, where the Supreme Court looked to statutory criminal intent to determine whether the intent was the same for purposes of same criminal conduct analysis. But the Supreme Court has not applied this analysis outside of the context of those particular crimes or expressly overruled the objective criminal intent test articulated in Dunaway, 109 Wn.2d at 215. See also State v. Haddock, 141 Wn.2d 103, 3 P.3d 733 (2000); State v. Tili, 139 Wn.2d 107, 985 P.2d 365 (1999); State v. Garza-Villarreal, 123 Wn.2d 42, 864 P.2d 1378 (1993); State v. Lessley, 118 Wn.2d 773, 827 P.2d 996 (1992); State v. Lewis, 115 Wn.2d 294, 797 P.2d 1141 (1990); State v. Burns, 114 Wn.2d 314, 788 P.2d 531 (1990). In any event, the crimes at issue do not have the same statutory criminal intent. For unlawful imprisonment, the required statutory intent required is to knowingly restrain another person, RCW 9A.40.040(1), whereas there is no intent required for second degree rape. See State v. Brown, 78 Wn. App. 891, 896, 899 P.2d 34 (1995) (reaffirming the rule that intent is not an element of second degree rape); State v. Walden, 67 Wn. App. 891, 895, 841 P.2d 81 (1992) (rape criminalizes nonconsensual sexual intercourse regardless of criminal intent or knowledge, so it is a strict liability crime).

[47] 174 Wn. App. 494, 548, 299 P.3d 37 (2013) (counsel rendered ineffective assistance by failing to argue that attempted rape and unlawful imprisonment offenses shared same criminal intent).

[48] 120 Wn. App. 800, 825, 86 P.3d 232 (2004) (counsel was deficient for failing to argue that rape and kidnapping convictions shared same criminal intent).

Even if I'm wrong about that, I don't see the same criminal intent. I think the defendant had two intents here. I think this is sometimes hard to see in cases involving abduction or restraint and sexual assault because, of course, abduction and restraint facilitate sexual assault. It's always easier to attack somebody in a more secluded location than, for example, out on the street. But in this case I think the defendant intended to do two things, and I think he made that very clear. The first thing he intended to do was have sexual relations with the victim here against her will and by the use of force and threats. And the second thing that he intended to do was make sure she didn't go anywhere for as long as he could possibly hold her.

I really, really think this is one of those unusual cases where the intents are different. They're not the same. And I'm not going to find the same criminal conduct here on these rather unique facts and this incredibly prolonged ordeal.[49]

In Saunders, under the facts of that case, this court held that defense counsel could have argued the defendant's primary motivation for kidnapping the victim was the same as his motivation for the rape, i.e., the kidnapping furthered the rape, but also recognized that the evidence was susceptible to more than one interpretation.[50] The court observed that, based on the evidence, the State could reasonably counter that the defendant kidnapped the victim with the intent to cause extreme mental distress, among other intents.[51] This is precisely the finding the court made here, that the crimes did not share the same intent because, although the restraint facilitated the sexual assault, Urbina had the additional separate intent to restrain A.R. for a prolonged period of time. The State's

---

[49] RP (May 5, 2017) at 902-03.

[50] Saunders, 120 Wn. App. at 825.

[51] Id.

16

allegation and the jury's finding that sexual gratification was one of the purposes of the unlawful restraint did not prevent such a finding.

On this record, we cannot conclude the sentencing court abused its discretion in finding that the rape and unlawful imprisonment did not constitute the same criminal conduct.

Affirmed.

WE CONCUR:

Andrus, J.